# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LCT CAPITAL, LLC, | § | |
| | § | |
| Appellant/Cross-Appellee, | § | Nos. 565, 2019 |
| Plaintiff below, | § | 568, 2019 |
| | § | |
| v. | § | |
| | § | Court Below – Superior Court |
| NGL ENERGY PARTNERS LP and | § | of the State of Delaware |
| NGL ENERGY HOLDINGS LLC, | § | |
| | § | |
| Appellees/Cross-Appellants, | § | C.A. No. N15C-08-109 |
| Defendants below. | § | |
| | § | |

Submitted: November 4, 2020
Decided: January 28, 2021
Corrected: March 4, 2021

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court. **AFFIRMED IN PART, REVERSED IN PART.**

Steven L. Caponi, Esquire, K&L GATES, LLP, Wilmington, Delaware; Roger R. Crane, Esquire (*argued*), and Thomas A. Warns, Esquire, K&L GATES, LLP, New York, New York; *for Appellant/Cross-Appellee LCT Capital, LLC.*

Steven T. Margolin, Esquire (*argued*) and Samuel L. Moultrie, Esquire, GREENBERG TRAURIG, LLP, Wilmington, Delaware; Hal S. Shaftel, Esquire (*argued*), Obiamaka P. Madubuko, Esquire, and Daniel Friedman, Esquire, GREENBERG TRAURIG, LLP, New York, New York; *for Appellees/Cross-Appellants NGL Energy Partners LP and NGL Energy Holdings LLC.*

**MONTGOMERY-REEVES**, Justice, for the Majority:

In 2014, appellant and cross-appellee LCT Capital, LLC ("LCT") helped appellee and cross-appellants NGL Energy Partners, LP and NGL Energy Holdings LLC (collectively, "NGL") acquire TransMontaigne, a refined petroleum products distributor. LCT played an unusually valuable role in the transaction, bringing the sale to NGL's attention, helping NGL to understand opaque but profitable aspects of TransMontaigne's business, and enabling NGL to submit its winning bid outside of an auction process. The transaction generated $500 million in value for NGL, more than double the $200 million price that NGL paid to acquire TransMontaigne.

NGL's CEO Mike Krimbill represented on several occasions that LCT would receive an unusually large investment banking fee, but the parties failed to reach an agreement on all of the material terms. After negotiations broke down completely, LCT filed suit in the Superior Court seeking compensation for its work under several theories, including *quantum meruit* and common law fraud.

At trial, LCT presented a unitary theory of damages that focused on the value of the services that it provided, measured by the fee that Krimbill proposed for LCT's work. Nonetheless, the jury verdict sheet had two separate lines for damages awards, one for the *quantum meruit* claim and another for the fraud claim. The jury found NGL liable for both counts, awarded LCT an amount of *quantum meruit* damages equal to a standard investment

1

banking fee, and awarded LCT a much larger amount of fraud damages approximately equal to the unusually large fee that Krimbill proposed.

Following post-trial briefing, the Superior Court set aside the jury's awards and ordered a new trial on damages. The court set aside the fraud award on the basis that the jury impermissibly awarded LCT benefit-of-the-bargain damages in the absence of an enforceable contract. The court set aside the *quantum meruit* award on the basis that providing the jury with multiple damages lines for a unitary theory of damages was confusing and may have caused the jury to spread a single award between the *quantum meruit* and fraud claims.

LCT and NGL both filed interlocutory appeals of the Superior Court's order. On appeal, LCT argues that benefit-of-the-bargain damages are available without an enforceable contract. Thus, the Superior Court erred by setting aside the jury's fraud award.

On cross-appeal, NGL argues that the Superior Court erred by ordering a new trial on damages because the jury's *quantum meruit* award fully compensated LCT for its harm. NGL also argues that it was entitled to judgment as a matter of law on the fraud claim. Finally, NGL argues that the Superior Court provided the jury with erroneous fraudulent misrepresentation jury instructions.

Having reviewed the parties' briefs and the record on appeal, and after oral argument, this Court holds that LCT was not entitled to benefit-of-the-bargain damages and that the Superior Court did not abuse its discretion by ordering a new trial on *quantum meruit*

damages. Nonetheless, this Court also holds that the Superior Court abused its discretion by ordering a new trial on fraud damages because LCT did not assert any independent damages to support its fraud claim. Accordingly, the Court affirms in part and reverses in part the Superior Court's December 5, 2019 Memorandum Opinion.

## I. BACKGROUND

### A. LCT Helps NGL Acquire TransMontaigne

After a long career at major financial institutions, Louis Talarico founded LCT.[1] LCT is a Delaware limited liability company that provides investment banking and other financial services related to transactions in the energy sector.[2]

In December 2013, Talarico learned that Morgan Stanley planned to sell TransMontaigne, a refined petroleum products distributor.[3] Talarico was familiar with TransMontaigne, thought that the sale would be an attractive investment, and began working his contacts at Morgan Stanley to gain access to the sale process.[4]

After twice failing to arrange a successful bid with other buyers, Talarico approached the Energy and Minerals Group ("EMG"), a substantial investor in NGL.[5] EMG agreed that TransMontaigne was an attractive target, but concluded that it lacked the ability to properly run TransMontaigne and suggested that Talarico approach NGL's CEO, Krimbill, about a

---

[1] Appendix to Opening Br. 375-76 (hereafter "A_").
[2] *See, e.g.*, A247-48.
[3] A388.
[4] A388-89, 95-98.
[5] *See* Appendix to Answering Br. 1534 (hereafter "B_").

3

partnership.[6]  Krimbill expressed interest in acquiring TransMontaigne and began working with Talarico, the UBS Group, and others to construct a winning bid.[7]

In May 2014, NGL submitted a winning bid of approximately $200 million to purchase all of TransMontaigne.[8]  The deal successfully closed in July 2014.[9]

Talarico played a "critical role" in the acquisition,[10] enabling NGL to submit its winning bid "outside of an auction process" and allowing NGL to acquire TransMontaigne for "the very attractive purchase price of $200 million" when "[o]ther potential buyers . . . were estimated to be offering $450 million . . . ."[11]  Further, Talarico helped NGL identify and correct a problem with how Morgan Stanley treated TransMontaigne's working capital, an important component to valuing the company.[12]

Talarico also helped NGL understand the value of TransMontaigne's marketing business.  TransMontaigne was comprised of two business segments, a "hard asset business" and a "marketing" business.[13]  Although Morgan Stanley wanted to sell all of TransMontaigne for regulatory reasons, most buyers were only interested in the hard asset

---

[6] B1540-43.

[7] *See* B1768-69.

[8] *See, e.g.*, A231.

[9] A236.

[10] A1261.

[11] A1261; A236.

[12] *See, e.g.*, A462-73.

[13] A407-08.

business.[14]  Talarico recognized that this piecemeal approach was a mistake because the marketing business could generate substantial cash flows for a suitable acquirer.[15]

Acquiring TransMontaigne created approximately $500 million of value for NGL.[16] According to a letter that Krimbill drafted months after closing, NGL "would never have had the opportunity to purchase TransMontaigne Inc. for $200 million" without LCT's help.[17]

## B.    The Fee Negotiations Break Down

Talarico and Krimbill did not reach an agreement on LCT's fee before the transaction closed.   In May 2014, Talarico proposed that LCT receive a 15% ownership interest in TransMontaigne, an option to purchase an additional 10%, and a gross-up payment to cover taxes.[18]  NGL countered by offering a 2% interest in the NGL GP.[19]

According to Talarico's trial testimony, Krimbill thought that NGL's counteroffer was too low and verbally agreed to push NGL to offer LCT:  (i) a 2% ownership interest in NGL, (ii) a tax gross-up payment, and (iii) an option to purchase an additional 3% ownership interest in NGL for $21 million.[20]  Assuming that NGL GP was worth $1 billion following the TransMontaigne acquisition, this offer would equate to a fee worth approximately $43.8

---

[14] A406-10.
[15] *See id.*
[16] A236.
[17] *Id.*
[18] A521-22.
[19] A226.
[20] *See, e.g.*, A563-64.

5

million including the tax gross-up payment, or approximately $29 million without the tax gross-up payment.[21]

The record contains some uncertainty regarding the existence and details of this verbal offer. Krimbill testified that he never made such an offer.[22] Further, Talarico wrote a contemporaneous message that can be read to suggest that Krimbill offered a mandatory buy-in of $21 million for a 5% ownership stake, not an automatic 2% ownership stake with an option to purchase an additional 3% stake.[23]

In June 2014, Talarico, Krimbill, NGL's outside counsel Bruce Toth, and others met to discuss the TransMontaigne transaction. According to Talarico's trial testimony, during the meeting Krimbill introduced Talarico to Toth, told Talarico that Toth "does all my [NGL] GP transactions," and instructed Toth that "for Lou [Talarico] and his partners . . . here's what we're going to do. We're going to give them 2 percent interest in the GP. We're going to pay their taxes. . . . [A]nd we're going to give them an option on another 3 percent at [a] $700 million" valuation.[24] Busy with finalizing the acquisition, Toth asked Talarico to send the details in an email.[25]

---

[21] *See, e.g.*, A1119-47.
[22] *See* A1197-200.
[23] *See* B1762.
[24] A564.
[25] A939.

6

The next day, Talarico sent Toth an email providing the details of the fee transaction that Krimbill purportedly proposed.[26] Talarico's email noted that "there will be other details to figure out."[27] Talarico did not copy anyone else on the email,[28] and Toth did not respond.[29]

A couple of weeks later Talarico called Toth to check-in on the fee transaction.[30] Toth told Talarico that "we are working on it," or words to that effect.[31] Despite this statement, Toth testified that his team "was not working on documentation" regarding LCT's fee at that time. Instead, Toth testified that his team was "working" with Krimbill and NGL "on the process of structuring a transaction."[32]

A few days later, Talarico sent Toth a follow-up email stating, "Mike [Krimbill] had indicated that I reach out to you to start the process of figuring out how we properly paper our GP interest—both 2% fee and 3% buy-in."[33] Talarico wrote that he was "open" to any thoughts that Toth had on structuring the transaction.[34] Talarico also acknowledged that he "briefly read thr[ough] the amended LLC agreement . . . and appreciate that there may be some steps or a process that NGL needs to complete for this all to happen."[35] LCT and NGL

---

[26] A230.
[27] *Id.*
[28] *Id.*
[29] *See* A941.
[30] *See* A949.
[31] *Id.*
[32] A950.
[33] B1811.
[34] *Id.*
[35] *Id.*

7

did not make any more progress on the fee arrangement before NGL closed the TransMontaigne acquisition.

For the better part of the next year, Krimbill and Talarico engaged in increasingly contentious negotiations, failing to agree on the details of LCT's fee. For example, in May 2014 Krimbill refused to offer a tax gross-up payment and deleted a "tax catch-up" figure from a spreadsheet that Talarico shared.[36] Nonetheless, Talarico testified at trial that "we made it very clear at the beginning that any fee compensation involving equity needed to have a tax gross-up associated with it."[37]

In October 2014, Krimbill sent a letter to NGL's owners regarding fees related to the TransMontaigne acquisition.[38] The letter proposed that NGL offer LCT a 5% ownership stake in exchange for a $21 million mandatory buy-in. Krimbill wrote,

> We are asking for a compensation arrangement for LCT as we would have never had the opportunity to purchase TransMontaigne Inc. for $200 million or a 3.0x multiple of EBITDA without them. We are proposing that LCT acquire 5% for [sic] our NGL General Partner for a $21 million purchase price.
>
> . . . .
>
> This equates to a $29 million success fee which appears to be high compared to a typical 1%-2% investment banker success fee. We are looking at the fee from the perspective of the value created to the NGL General Partner and the very attractive purchase price of $200 million. LCT was able to get [Morgan

---

[36] *Compare* B1763-64 (including tax gross-up) *with* B1766-67 (deleting tax gross-up).
[37] A528.
[38] A236.

> Stanley] to deal directly with NGL outside of an auction process which may have saved us tens of millions of dollars. Other potential buyers . . . were estimated to be offering $450 million, per the Wall Street Journal.[39]

Thus, the parties seem to have backed away from the 2% ownership stake with the option to purchase an additional 3% that Talarico claimed that Krimbill offered LCT in May. The parties also failed to determine what type of interest LCT would receive in NGL GP[40] and did not settle whether LCT would agree to an extended period of service.[41]

In November 2014, Krimbill backed away from offering LCT a 5% ownership stake for $21 million and pushed for a lower fee.[42] Negotiations eventually broke down, and Krimbill told Talarico "if you want your fee, you have to sue me."[43]

## C. LCT Capital Files Suit in the Superior Court

In August 2015, LCT filed its initial complaint in the Superior Court.[44] LCT filed an amended complaint in September 2015, alleging three counts.[45] Count I alleged that NGL breached a contract that "would pay LCT with a fee consisting of (i) a 2% ownership interest in NGL Holdings at a $700 million valuation, with LCT's taxes to be paid by NGL; and (ii) the option to purchase an additional 3% ownership interest in NGL Holdings at a

---

[39] *Id.* (emphasis added).
[40] *See* B1811 (expressing uncertainty about how to structure the equity transaction).
[41] A1016-17.
[42] A587.
[43] *Id.*
[44] *See LCT Cap., LLC v. NGL Energy P'rs*, 2019 WL 6896463, at *1 (Del. Super. Dec. 5, 2019).
[45] *See* A239.

$700 million valuation."[46] In other words, Count I alleged that LCT and NGL formed an oral contract based on the fee that Krimbill purportedly offered Talarico in May 2014.

Count II alleged both *quantum meruit* and unjust enrichment claims on the basis that NGL knowingly accepted LCT's investment advising services without compensation.[47]

Count III alleged that NGL committed common law fraud because,

> Mr. Krimbill, acting in his capacity as Chief Executive Officer of NGL and a Director of NGL Holdings, represented to LCT that it would receive a 2% ownership interest in NGL Holdings at a $700 million valuation, with LCT's taxes to be paid by NGL, and the option to purchase an additional 3% ownership interest in NGL Holdings at a $700 million valuation, as a fee for its services . . . .[48]

In July 2018, the Superior Court granted NGL's motion for summary judgment and dismissed both the breach of contract and unjust enrichment claims.[49] Regarding the breach of contract claim, the court held that the parties did not form an oral contract because "neither party manifested objective assent" and "the essential terms were not sufficiently definite to determine a breach and an appropriate remedy. . . . LCT's finder's fee was never fully defined nor were the obligations Plaintiff was required to meet to be entitled to a fee. . . ."[50]

The court cautioned that its order dismissing LCT's breach of contract claim

---

[46] A291.

[47] A295-96.

[48] A296-97.

[49] A305.

[50] A325-27 (citing *Eagle Force Hldgs., LLC v. Campbell*, 2018 WL 2351326, at *15 (Del. May 24, 2018); *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010)).

[was] in no way implying that the conversations, discussions, communications and emails between the parties and their representatives are no longer relevant. They are. If the CEO of NGL made representations that he believed the compensation package suggested by LCT was fair and appropriate and was working toward accomplishing it, those comments are relevant to the *quantum meruit* claim. If there are discussions with NGL's counsel regarding the alleged terms, those discussions and correspondence are relevant.[51]

The court also dismissed the unjust enrichment claim on the basis that LCT's amended complaint improperly pled *quantum meruit* and unjust enrichment as a single claim and that LCT could not obtain unjust enrichment because it had adequate legal remedies.[52]

## D. The Superior Court Trial

The Superior Court held a jury trial beginning in July 2018.[53] At the close of evidence, NGL moved for judgment as a matter of law, raising two arguments.[54] First, NGL argued that only the *quantum meruit* claim should go to the jury because LCT presented a unitary damages claim for both counts and NGL admitted liability for the *quantum meruit* claim.[55] Second, NGL argued that LCT failed to present sufficient evidence establishing the elements of fraud and instead attempted to bootstrap a fraud claim to facts establishing, at most, an ordinary breach of contract or *quantum meruit* claim.[56]

---

[51] A328-29 (emphasis added).

[52] A330.

[53] *LCT*, 2019 WL 6896463, at *1.

[54] *See* A1278-87.

[55] A1283-84.

[56] A1284-85.

11

The court seemed to agree that LCT presented a unitary damages case, observing that "the damages are the damages whether it's *quantum meruit* or its fraudulent misrepresentation. There's been no evidence separating them. They're the same."[57] Nonetheless, the court determined that it could avoid the risk of double-counting damages by giving the jury one damages line for both counts.[58]

The court also rejected NGL's argument that LCT failed to present sufficient evidence to establish fraud, stating "[d]o I think the fraudulent misrepresentation case is a smoking gun? No. Do I think there's sufficient evidence to allow it to go to the jury? Yes."[59]

The court also denied a separate motion by LCT to amend the fraud claim to seek punitive damages, holding

> I don't find this to be a case where punitive damages [are] warranted.
>
> . . . .
>
> Do I think this is an unfortunate common circumstance in the world of corporate business? Yes. Do I like it? No. Do I wish . . . there w[ere] greater ethics in America? . . . [Y]es.
>
> But . . . this is not that case [where punitive damages are warranted]. At the end of the day this is a dispute between two very high-powered ego people who have different opinions about what was agreed to. And I'm not going to make it something more than what it is.[60]

---

[57] A1295.
[58] A1296.
[59] *Id.*
[60] A1300.

Thus, the Superior Court sent both the fraudulent misrepresentation and *quantum meruit* claims to the jury. The Superior Court made two key decisions when sending the case to the jury. First, the court provided the jury with the following (excerpted) instruction for fraudulent misrepresentation.

> The second claim alleges fraudulent misrepresentation. In order to establish the claim of fraudulent misrepresentation, LCT must prove the following by a preponderance of the evidence:
>
> 1) NGL made false representations of material facts that are important to LCT;
>
> 2) that NGL had knowledge or belief that these representations were false, or were made with reckless indifference to the truth;
>
> 3) the misrepresentations were made with the intent to induce LCT to act or to decline to act on the false representations;
>
> 4) that LCT justifiably relied on the false representation; and
>
> 5) as a result of that reliance, LCT suffered damages.
>
> . . . .
>
> NGL's representation does not need to have been overt. Rather, NGL's deliberate concealment of a material fact or silence in the face of a duty to speak is sufficient for a claim of intentional misrepresentation. Moreover, the term "misrepresentation" is sufficiently broad to encompass fraudulent, negligent, or even innocent statements.[61]

Although the court instructed the jury that NGL was only liable if it acted with knowledge or recklessness, the instruction also defined "misrepresentation" broadly to

---

[61] A1322-23 (emphasis added).

13

include "negligent or even innocent statements."[62]  NGL did not object to this jury instruction, although it attempted unsuccessfully to add an instruction advising the jury not to award damages for the dismissed breach of contract claim.[63]

Second, the court reversed course on the single-damages-line approach and decided to give the jury a verdict sheet providing separate damages lines for the *quantum meruit* and fraudulent misrepresentation claims.  The *quantum meruit* damages line appeared first and asked, "What do you find to have been the fair value of the services that LCT provided to NGL?"[64]  The jury answered "$4 million."

Next, the verdict sheet asked, "Do you find that LCT has proven by a preponderance of the evidence its claim of fraudulent misrepresentation?"[65]  The jury answered "yes" with a checkmark—finding that LCT proved fraud—and proceeded to the next question.

The next question asked, "Are the damages for fraudulent misrepresentation the same as those you found for *quantum meruit*?"[66] The jury answered "no" with a checkmark— finding that the damages were not the same for fraud and *quantum meruit*—and proceeded to the final question.

---

[62] *See id.*
[63] *See* B2224 ("And we have three brief additional proposed instructions . . . .  One is that the jury is not ruling on a contract claim . . . ."); B2677.
[64] A1338.
[65] *Id.*
[66] *Id.*

The final question asked the jury to "[s]tate the amount of your award of damages for LCT's claim of fraudulent misrepresentation." The jury answered "$29 million." The court provided the jury with minimal guidance regarding how to measure fraud damages, instructing the jury that "[i]f you find that LCT has met the elements of fraudulent misrepresentation, you should determine the damages that LCT suffered that are a direct result of the false misrepresentations."[67]

Thus, the jury found that: (i) the fair value of LCT's services was $4 million, (ii) LCT proved the elements of fraudulent misrepresentation, (iii) the damages for *quantum meruit* and fraud were not the same, and (iv) NGL's fraud caused LCT $29 million of damage.

### E.    The Superior Court Orders a New Trial on Damages

After receiving the jury's verdict, the Superior Court denied NGL's motion for judgment as a matter of law under Rule 50(a).[68] The same day, NGL filed a renewed motion seeking judgment as a matter of law under Rule 50(a) and a new trial under Rule 59.[69] NGL's renewed motion raised three arguments. First, NGL argued that the jury improperly awarded benefit-of-the-bargain damages in the absence of an enforceable contract regarding LCT's finder's fee.[70] Second, NGL argued that LCT failed to prove the elements of fraudulent

---

[67] A1323 (jury instructions sheet); *see also* B2624, at 127:17-20 (transcript of the court providing the jury with an identical oral instruction).

[68] *See* A1340.

[69] *See* B2680-99.

[70] *See* B2689-92.

misrepresentation.[71]  Third, NGL argued that because LCT presented a unitary damages theory, the court should either limit LCT's recovery to the jury's $4 million *quantum meruit* award or order a new trial on fraud damages with an instruction that the jury cannot award benefit-of-the-bargain damages.[72]

In December 2019, the Superior Court issued its Memorandum Opinion granting in part and denying in part NGL's renewed motion for judgment as a matter of law and for a new trial.  The court construed NGL's motion as raising two issues.  The first issue was whether NGL was entitled to judgment as a matter of law because LCT failed to prove fraud.[73]  The court denied the motion for judgment as a matter of law on the fraud claim, holding that

> the jury agreed with Plaintiff that NGL, specifically Krimbill, misled Plaintiff on numerous occasions to believe a unique fee arrangement was both plausible and going to happen, and there was evidence that would clearly support this conclusion. Krimbill's testimony was unbelievable, and it was supported by several other witnesses who were less than candid or credible.[74]

The second issue was whether the Superior Court should order a new trial on damages because the jury improperly awarded LCT benefit-of-the-bargain damages or was confused regarding the proper damages award.[75]  Recognizing that the availability of benefit-of-the-

---

[71] *See* B2693-98.
[72] *See* B2696-98.
[73] *LCT*, 2019 WL 6896463, at *4.
[74] *Id.*
[75] *Id.* at *3.

16

bargain damages was unsettled under Delaware law, the court surveyed non-controlling case

law that the parties cited and concluded that

> to get damages under the benefit-of-the-bargain concept, the contractual bargain must have been created and formalized. . . . While perhaps incredibly unfair to the unique factual setting of the case in light of the reprehensible conduct of the Defendants, the Court must find you do not get the bargain if it is not clearly created.[76]

Nonetheless, the court held that a new trial on damages was needed because the

separate damages lines for *quantum meruit* and fraudulent misrepresentation

> simply muddied the damage award to the point that it is impossible to determine what the jury believed was a fair and reasonable determination of the real damages here . . . .
>
> The Court . . . has struggled to come up with a fair resolution of this dispute. Unfortunately, the Court could foresee the possibility that if a single damage figure was requested, the jury could have decided the compensation agreed to by Krimbill of more than $29 million was the fair and reasonable compensation for the unique serviced provided and [the jury] only divided the damages on the verdict sheet because they were requested to do so. On the other hand, perhaps they would have accepted Defendants' theory of a reasonable compensation of the standard investment banker fee and only awarded $4 million. The Court is simply not willing to accept Defendants' assertion that only the *quantum meruit* award here represents the damages that the jury believed was fair compensation for the unique services Plaintiff provided. Even Krimbill . . . believed compensation beyond the norm was appropriate.[77]

---

[76] *Id.* at *7.
[77] *Id.* (emphasis added).

Thus, the court ordered a new trial to determine the proper measure of damages but upheld the jury's finding that LCT proved its fraudulent misrepresentation claim.[78]

### F. LCT and NGL File Interlocutory Appeals

LCT and NGL both timely moved for leave to file an interlocutory appeal of the Superior Court's order.[79] LCT sought to appeal the Superior Court's determination that benefit-of-the-bargain damages are unavailable for a fraud claim without an enforceable contract.[80] NGL sought to appeal the Superior Court's determinations "setting aside . . . the $4 million *quantum meruit* verdict, upholding . . . the jury instruction on fraudulent misrepresentation, and ruling that the evidence supported the fraudulent misrepresentation verdict."[81]

The Superior Court granted LCT's request to certify an appeal regarding the availability of benefit-of-the-bargain damages but denied NGL's request to appeal regarding "whether the jury instruction on fraudulent misrepresentation was correct and whether the evidence supported LCT's fraud claim."[82]

This Court agreed to hear interlocutory appeals on all of the issues that both parties raised.[83]

---

[78] *Id.* at *7-8.
[79] Ex. B to Opening Br. 1.
[80] Ex. C to Opening Br. 2.
[81] *Id.* at 2-3.
[82] *Id.* at 3.
[83] *Id.* at 4.

## II. STANDARD OF REVIEW

"This Court reviews questions of law *de novo*."[84]  This Court also reviews *de novo* the trial court's decision to deny judgment as a matter of law under Superior Court Civil Rule 50.[85]  Judgment as a matter of law is appropriate if "there is no legally sufficient evidentiary basis for a reasonable jury to find" for non-moving party.[86]  When considering a motion for judgment as a matter of law, the Court must view the evidence and draw all reasonable inferences "in a light most favorable to the non-moving party."[87]  "The moving party bears the burden of demonstrating both the absence of a material fact and entitlement to judgment as a matter of law."[88]

This Court reviews the Superior Court's decision to order a new trial for abuse of discretion.[89]  When considering a motion for a new trial, the Superior Court "must give

---

[84] *Klassen v. Allegro Dev. Corp.*, 106 A.3d 1035, 1043 (Del. 2014); *see also Brigade Leveraged Cap. Structures Fund Ltd. v. Stillwater Mining Co.*, 240 A.3d 3, 9 (Del. 2020) ("This Court reviews errors of law *de novo*."); *DV Realty Advisors LLC v. Policeman's Annuity and Benefit Fund of Chi.*, 75 A.3d 101, 108 (Del. 2013).

[85] *Blue Hen Lines, Inc. v. Turbitt*, 787 A.2d 74, 77 (Del. 2001) ("This Court reviews *de novo* the Superior Court's decision to grant summary judgment under Super. Ct. Civ. R. 50.").

[86] Super. Ct. Civ. R. 50(a).

[87] *Blue Hen*, 787 A.2d at 77 ("On appeal, the Court 'must determine "whether the evidence and all reasonable inferences that can be drawn therefrom, taken in a light most favorable to the non-moving party, raise an issue of material fact for consideration by the jury."'" (quoting *Trievel v. Sabo*, 714 A.2d 742, 744 (Del. 1998))).

[88] *Id.*

[89] *See, e.g.*, *O'Riley v. Rogers*, 69 A.3d 1007, 1010 (Del. 2013).

'enormous deference' to the jury's verdict,"[90] and "should not set aside" the jury's verdict "unless . . . a reasonable jury could not have reached the result."[91]

Regarding jury instructions, this Court "must reverse" a verdict "[w]here an inaccuracy in the instructions may lead to confusion that undermines either the jury's ability to reach a verdict or our confidence in [the jury's] ability to do so fairly under the circumstances . . . ."[92] "In evaluating the propriety of a jury charge, the jury instructions must be viewed as a whole."[93] If a party fails to timely object to a jury instruction at trial, this Court reviews the instruction for plain error.[94] "[P]lain errors 'undermine the jury's ability to intelligently perform its duty in returning a verdict.' Thus, 'an improper jury instruction may amount to plain error despite a defendant's acceptance of it.'"[95]

## III.  ANALYSIS

This appeal requires the Court to decide three issues.  First, whether LCT could receive benefit-of-the-bargain fraud damages even though the parties did not form an enforceable agreement governing LCT's fee.  Second, whether the Superior Court abused

---

[90] *Cuonzo v. Shore*, 958 A.2d 840, 844 (Del. 2008) (quoting *Young v. Frase*, 702 A.2d 1234, 1236 (Del. 1997)).

[91] *Storey v. Camper*, 401 A.2d 458, 465 (Del. 1979).

[92] *Banther v.* State, 884 A.2d 487, 492-93 (Del. 2005) (citing *Bordley v. State*, 832 A.2d 1250 (Del. 2003)).

[93] *Culver v. Bennett*, 588 A.2d 1094, 1096 (Del. 1991) (citing *Probst v. State*, 547 A.2d 114, 119 (1988)).

[94] *See, e.g.*, *Riggins v. Mauriello*, 603 A.2d 827, 830-31 (Del. 1992).

[95] *Volkswagen v. Costello*, 880 A.2d 230, 234-45 (Del. 2005) (quoting *Culver*, 588 A.2d at 1096; *Bullock v. State*, 775 A.2d 1043, 1054 (Del. 2001)).

its discretion by ordering a new trial on damages for LCT's fraudulent misrepresentation claim. Third, whether the Superior Court abused its discretion by ordering a new trial on damages for LCT's *quantum meruit* claim.[96]

We address each issue in turn.

## A.     LCT Could Not Obtain Benefit-of-the-Bargain Damages

Under Delaware law, "[t]he damages available for deceit or fraudulent misrepresentation are generally limited to those which are the direct and proximate result of the false representation . . . ."[97] The scope of fraud damages is broad, allowing "[a] plaintiff . . . [to] recover for any injury resulting from the direct and natural consequences of [the plaintiff] acting on the strength of the defendant's statements," provided that such injuries were "within [the defendant's] contemplation when the fraud was committed."[98]

Delaware law recognizes two primary approaches for measuring the harm that the defendant's fraud proximately caused, benefit-of-the-bargain damages and out-of-pocket

---

[96] NGL also argues that the Superior Court erred by refusing to dismiss the fraud claim because LCT failed to prove reliance, Answering Br. 54, and that this Court should set aside the jury's award because the Superior Court provided the jury with erroneous instructions regarding the elements of a fraud claim, *id.* at 60. We need not reach either argument, however, because we hold that LCT's fraud claim failed for a separate reason. *See infra* III.B.

[97] *Harman v. Masoneilan Int'l, Inc.*, 442 A.2d 487, 499 (Del. 1982) (citing *Poole v. N.V. Deli Maatschappij*, 224 A.2d 260 (Del. 1966)); *see also Brzoska v. Olson*, 668 A.2d 1355, 1367 (Del. 1995) ("In general, a recovery for fraudulent misrepresentation is limited to economic damages, *i.e.*, those damages which are the direct and proximate result of the false representation consisting of the loss of bargain or actual out of pocket losses.") (citations omitted); *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1077 (Del. 1983) ("Of course the defendant's liability extends only to any injury to the plaintiff which was within his contemplation when the fraud was committed.") (citations omitted).

[98] *Stephenson*, 462 A.2d 1077 (citations omitted).

21

damages.[99]  Benefit-of-the-bargain damages are equal to "the difference between the actual and the represented values of the object of the [fraudulent] transaction."[100]  Awarding benefit-of-the-bargain damages "put[s] the plaintiff in the same financial position that [the plaintiff] would have been in if the defendant's representations had been true."[101]  Out-of-pocket damages are equal to "the difference between what [the plaintiff] paid and the actual value of the item" that the plaintiff received.[102]  Awarding out-of-pocket damages "restore[s] the plaintiff to [their] financial position before the transaction occurred."[103]

Regardless of the approach taken, the goal is the same—to remedy injuries that the fraud proximately caused.  Thus, the "'plaintiff is entitled to compensation to make [the plaintiff] whole, but no more.'  In other words, the remedy for the tort should put the plaintiff as close as possible to the same position as she was in before the injury."[104]

The Superior Court held that LCT cannot recover benefit-of-the-bargain damages because the parties did not form an enforceable contract regarding LCT's fee.[105]  LCT argues that this ruling is contrary to binding Delaware Supreme Court authority and other non-

---

[99] *Id.* at 1076 (citations omitted).
[100] *Id.* (citations omitted).
[101] *Id.*
[102] *Id.* (citations omitted).
[103] *Id.*
[104] *Stayton v. Del. Health Corp.*, 117 A.3d 521, 534 (Del. 2015) (quoting *Mitchell v. Haldar*, 883 A.2d 32, 38 (Del. 2005)).
[105] *LCT*, 2019 WL 6896463, at *7.

Delaware case law.[106]  NGL responds that the Superior Court's holding is consistent with

Delaware case law and other non-Delaware case law.[107]

### 1. Existing Delaware case law does not clearly answer whether benefit-of-the-bargain damages require an enforceable agreement

Both LCT and NGL point to Delaware case law in support of their positions regarding

whether a plaintiff may receive benefit-of-the-bargain damages for a fraud claim without an

enforceable contract.

LCT argues that benefit-of-the-bargain damages are available without an enforceable

contract under this Court's holding in *Stephenson*.[108]  In *Stephenson*, the plaintiff entered into

a contract to purchase a townhome relying on the defendant's separate and fraudulent

promise to offer low-interest financing when prevailing mortgage interest rates were high.[109]

The parties did not form an enforceable financing agreement.[110]  Nonetheless, the Court held

that the plaintiff could recover the benefit of the low-interest financing bargain because "the

increased financing costs" that the plaintiff faced on the open market were "a direct and

proximate result of [the defendant's] misrepresentations."[111]

The Court noted,

> At the time of this transaction it is conceivable that if the
> relatively low-interest mortgages were not available, a buyer,

---

[106] Opening Br. 19-42.
[107] Answering Br. 23-47.
[108] *See, e.g.*, Opening Br. 21.
[109] 462 A.2d at 1076.
[110] *Id.*
[111] *Id.* at 1077.

23

who would have to obtain a mortgage with a higher interest rate and possibly a greater down payment, may have found little or no attraction for this property. In the abstract that sounds speculative, but as to this plaintiff, . . . that situation was very real. She consistently made known her desire to buy this [town]house because of the favorable mortgage terms that [the defendant] said were available.[112]

In reaching that conclusion, the Court stated that "[t]he most common and accepted standard [of fraud damages] is the benefit of the bargain rule."[113] However, in *Stephenson* "[t]he financing plans involved . . . c[ould] not be regarded as independent and divisible from the sale of the . . . townhouse."[114] Thus, *Stephenson* does not address whether a plaintiff can receive benefit-of-the-bargain damages where that bargain is not connected to an enforceable contract, as is the case with LCT's fee.[115]

NGL responds that "Delaware courts have . . . held that a plaintiff may recover additional benefit-of-the-bargain damages for fraud only where the plaintiff was 'induce[d] to form a contract.'"[116] NGL relies heavily on the Court of Chancery's opinion in *Shuttleworth*, which NGL claims establishes that benefit-of-the-bargain damages require an enforceable contract.[117] In *Shuttleworth*, the plaintiff claimed that she contributed a disproportionate share of her income to support her household in reliance on her husband's

---

[112] *Id.*

[113] *Id.* at 1076.

[114] *Id.* at 1075.

[115] *See, e.g.*, A325-27.

[116] Answering Br. 24 (quoting *Shuttleworth v. Abramo*, 1994 WL 384428, at *6 (Del. Ch. July 14, 1994)).

[117] Answering Br. 33.

24

promise that he would leave the plaintiff all of his property upon his death.[118]  The court had

previously ruled that the statute of limitations prevented the plaintiff from bringing a breach

of contract claim on the husband's promise.[119]

The court held that the plaintiff was not entitled to any damages because she "was not

in fact financially injured."[120]  Instead, the plaintiff "had already received, by operation of

law or distributions from her husband's estate, property far in excess" of the amount of her

disproportionate contributions to the household.[121]  In reaching that conclusion, the court

stated that because "the plaintiff's suit to enforce the alleged contract is time-barred, . . . [t]he

remedy for the remaining fraud claim, if there is to be one, is restricted to restitution, through

which the court must endeavor to restore the plaintiff to her position prior to her husband's

alleged misrepresentations, or actual damages."[122]  We agree that *Shuttleworth* can be read

to hold that benefit-of-the-bargain damages are unavailable without an enforceable contract,

but we note that *Shuttleworth* addresses a unique factual context.[123]

The other Delaware decisions that the parties cite either expressly state that benefit-

of-the-bargain damages are available where the fraud induced the plaintiff to form a separate

---

[118] 1994 WL 384428, at *4.
[119] *See id.*
[120] *Id.* at *5.
[121] *Id.* at *7.
[122] *Id.* at *6.
[123] *See id.*

contract or suggest without squarely holding that benefit-of-the-bargain damages require an enforceable contract.[124]

### 2. Non-Delaware case law reveals diverging approaches to whether benefit-of-the-bargain damages require an enforceable agreement

The parties also rely on non-Delaware case law to support their positions. Many courts have held that a plaintiff cannot recover benefit-of-the-bargain tort damages without an enforceable contract.[125] For example, in *Roboserve, Inc. v. Kato Kagaku Co., Ltd*, the Seventh Circuit held that under Illinois law

> [w]here a misrepresentation induced the victim to consummate the bargain, benefit-of-the-bargain damages are appropriate . . . . Such damages are clearly not appropriate, however, in the absence of an actual, binding agreement. Damages for common law fraud are not intended to restore what one never had.[126]

---

[124] *See, e.g.*, *E.I. DuPont De Nemours & Co. v. Fla. Evergreen Foliage*, 744 A.2d 457, 457 (Del. 1999) ("[U]nder Delaware law, a tort claimant fraudulently induced to execute a release may opt either for recession or a separate suit for fraud with damages calculated on the difference between that received under the release and the value of the settlement or recovery achieved had there been no fraud by the released party."); *Manzo v. Rite Aid Corp.*, 2002 WL 31926606, at *5 (Del. Ch. Dec. 19, 2002) ("[P]laintiff asserts that she is entitled to 'benefit of the bargain damages.' The amended complaint fails to articulate any specific bargain from which these benefits purportedly flow and, therefore, does not state a cognizable injury." (internal quotation marks omitted)), *aff'd* 825 A.2d 239 (Del. 2003); *Clark v. Teeven Hldg. Co.*, 625 A.2d 869, 877 (Del. Ch. 1992) ("A defrauded party may elect to affirm the challenged contract and seek money damages. He then has an action at law for the tort of deceit.") (citing *Hegarty v. Am. Commonwealths Power Corp.*, 163 A. 616, 619 (Del. 1932); *Mackenzie Oil Co. v. Omar Oil & Gas Co.*, 154 A. 883, 891 (Del. 1929)); *Tam v. Spitzer*, 1995 WL 510043, at *10 (Del. Ch. Aug. 17, 1995) ("Where, as here, a party is fraudulently induced to enter into a contract, the defrauded party may elect either to affirm the contract and sue at law for money damages, or disaffirm and seek recission in equity." (citations omitted)).

[125] *See generally* Answering Br. 22-41 (collecting cases).

[126] 78 F.3d 266, 274 (7th Cir. 1996).

Similarly, in *Bohnsack v. Varco, L.P.*, the Fifth Circuit held that under Texas law "benefit-of-the-bargain damages compensate litigants only for injuries that arise out of an enforceable contract" and are therefore generally unavailable for common law fraud claims.[127]

On the other hand, there is authority allowing a plaintiff to recover benefit-of-the-bargain damages without an enforceable contract.[128] For example, in *Lewis v. Citizens Agency of Madelia, Inc.*, the Minnesota Supreme Court held that the plaintiff could recover the life insurance proceeds under a life insurance policy that the insurer never issued.[129] The plaintiff's husband applied for a life insurance policy, naming the plaintiff as the beneficiary.[130] For reasons unknown, the insurer never issued the policy.[131] Nonetheless, insurance agents falsely told the plaintiff on several occasions that the policy would provide a death benefit.[132]

The plaintiff detrimentally relied on these misrepresentations by continuing to pay the premiums owed under the policy, taking out a loan, and making other financial decisions under the assumption that the policy would pay a death benefit.[133] The plaintiff did not

---

[127] 668 F.3d 262, 277 (5th Cir. 2012) (citation omitted).
[128] *See generally* Opening Br. 33-38 (collecting cases); Reply Br. 22-27 (same).
[129] 306 Minn. 194, 200-01 (1975).
[130] *Id.* at 196.
[131] *Id.*
[132] *Id.* at 196-99.
[133] *See, e.g.*, *id.* at 200-01.

discover that the life insurance policy was invalid until her husband died, at which point it was too late to obtain alternative coverage.[134]

The Minnesota Supreme Court acknowledged that "a return of the out-of-pocket damages will, in most cases, return the injured party to the exact same position she would have been in, but for the misrepresentation."[135]  Nonetheless, the Court held that on these facts, the plaintiff

> cannot be made whole by a mere return of the premiums, since in the interim her husband became definitely uninsurable and died thereafter. . . .
>
> Thus, . . . it seems reasonable to us that the natural and proximate loss suffered by [the plaintiff] was the life insurance proceeds she expected to receive upon her husband's death and not merely the premiums supporting the policy.[136]

### 3. LCT cannot receive benefit-of-the-bargain damages to protect its expectation interest in NGL's false promises

At first blush, the above discussion might suggest that it is difficult to identify a universal approach to measuring a plaintiff's damages in this context.  Nonetheless, we think that the principles underlying tort damages reveal more consistency than an initial reading of the case law might suggest.  The purpose of tort damages is to compensate the plaintiff for the harm that the defendant's tortious conduct proximately caused.[137]  Where the defendant's

---

[134] *Id.* at 197.

[135] *Id.* at 200.

[136] *Id.* at 200-01.

[137] *See, e.g.*, *Harman*, 442 A.2d at 499; *Brzoska*, 668 A.2d at 1367.

fraud did not induce the plaintiff to form a contract, out-of-pocket damages typically measure the full scope of plaintiff's injuries. Stated differently, out-of-pocket damages typically would remedy the natural and proximate loss sustained by a party due to reliance on a misrepresentation. This rule focuses on the operative inquiry under tort law—what was lost by reason of the deception, or what compensation is necessary to make the plaintiff whole. Thus, in the absence of an enforceable contract, the default remedy for fraud is out-of-pocket damages.

Cases like *Lewis* and *Stephenson* show that there are some circumstances, however, where out-of-pocket damages would not make the plaintiff whole. In these rare cases, benefit-of-the-bargain damages may be appropriate even though the parties did not form an enforceable agreement. But even in these unusual circumstances, benefit-of-the-bargain damages serve the same function as out-of-pocket damages: to compensate the plaintiff for the harm that the defendant's fraud proximately caused. In *Lewis* and *Stephenson* benefit-of-the-bargain damages were appropriate because out-of-pocket damages would not capture the harm that the plaintiffs suffered by reasonably and foreseeably relying on the defendants' misrepresentations to make other decisions, such as buying property relying on the defendant's fraudulent promise to offer low-interest financing,[138] or choosing not to search for alternative life insurance coverage relying on the defendant's misrepresentations that a

---

[138] *See Stephenson*, 462 A.2d at 1076.

life insurance policy would pay a death benefit.[139]  The key point is that in these rare cases, benefit-of-the-bargain damages were necessary to compensate the plaintiff for harm that the plaintiff suffered by relying on the defendant's fraud, not to protect the plaintiff's expectation interest in the defendant's false promises.

With these principles in mind, the question on appeal is whether this is the rare case where, despite the absence of an enforceable agreement, benefit-of-the-bargain damages are needed to make the plaintiff whole.  Stated differently, did LCT seek benefit-of-the-bargain damages to provide compensation for harm that out-of-pocket damages would not measure?  Or did LCT seek benefit-of-the-bargain damages to protect its expectation interests in NGL's false representations?  If the later, LCT cannot receive benefit-of-the-bargain fraud damages.

Having reviewed the record, it appears that LCT presented a unitary theory of damages below that focused exclusively on the value of the services that it provided without compensation.[140]  LCT did not present evidence of other types of actual damages.[141]

Given this unitary approach, out-of-pocket damages equal to the value of the services that LCT provided without compensation would compensate LCT for all of the harm that NGL's fraud proximately caused.  It therefore appears that LCT seeks benefit-of-the-bargain damages solely to protect its expectation interests in the bargain that Krimbill proposed but

---

[139] *See Lewis*, 306 Minn. at 200-01.
[140] *See, e.g.*, A1295 ("[T]he damages are the damages whether it's *quantum meruit* or its fraudulent misrepresentation.  There's been no evidence separating them.  They're the same.").
[141] *See, e.g., id.*

the parties never formed because they could not agree on all of the material terms. That is a remedy that LCT cannot receive.

We also note the difficulty of fairly and accurately valuing the benefit of a bargain that the parties never formed. Even if the details of Krimbill's offer are ascertainable,[142] we do not know what terms the parties would have agreed to because the parties never agreed to all of the material terms of LCT's fee.[143] Given this uncertainty, it is unclear how LCT could have provided the jury with a reasonable basis for inferring the value of the hypothetical bargain to which LCT and NGL would have agreed. This uncertainty also creates a risk that benefit-of-the-bargain damages would provide LCT with a windfall by awarding LCT with the benefit of a generous bargain to which NGL would not have agreed. Such a windfall would be contrary to Delaware law.[144]

Accordingly, we affirm the Superior Court's holding that LCT cannot receive benefit-of-the-bargain damages on the facts of this case.[145]

---

[142] *See, e.g.*, A236 (Krimbill's letter to NGL's stockholders suggesting that LCT receive a "success fee" worth approximately $29 million).

[143] A325-27.

[144] *See, e.g.*, *Stayton*, 117 A.3d at 534 ("In Delaware, 'a plaintiff is entitled to compensation to make him whole, but no more.' In other words, the remedy for the tort should put the plaintiff as close as possible to the same position as she was in before the injury." (quoting *Mitchell v. Haldar*, 883 A.2d 32, 38 (Del. 2005))).

[145] Because we hold that LCT cannot receive benefit-of-the-bargain damages on the facts of this case, we need not address NGL's argument that LCT is estopped from seeking benefit-of-the-bargain damages. Answering Br. 23, 28-29.

### 4. LCT's other arguments in favor of benefit-of-the-bargain damages are unpersuasive

LCT raises four more sub-issues that we must briefly address. First, LCT argues that "[i]t would be completely inconsistent and inappropriate for benefit of the bargain damages to be available for promissory estoppel claims in the absence of a contract but not for" fraud claims.[146] We think that LCT draws a false parallel between promissory estoppel and fraud. Promissory estoppel is a quasi-contract doctrine that protects different interests than common law fraud.[147] It is therefore unremarkable that a plaintiff might be entitled to different remedies for these different causes of action.

Second, LCT argues that it should not be punished for the lack of a written contract because NGL's fraud caused the parties to not form a written agreement.[148] But, as the Superior Court held, there was no written agreement because the parties never agreed to the material terms of LCT's fee.[149] Thus, the parties' failure to agree caused the lack of a written agreement, not NGL's fraudulent misrepresentations.

---

[146] *Id.* at 30.
[147] *See, e.g.*, *Windsor I, LLC v. CWCapital Asset Mgmt. LLC*, 238 A.3d 863, 876 (Del. 2020) ("To state a claim for promissory estoppel, a plaintiff must prove by clear and convincing evidence that: '(i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (iii) the promisee reasonably relied on the promise and took action to his detriment; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise.'" (quoting *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 347–48 (Del. 2013))).
[148] *Id.* at 38-39.
[149] A325-27.

Third, LCT argues that benefit-of-the-bargain damages are needed to vindicate Delaware's strong public policy against lying and fraud.[150] Elsewhere, LCT makes a similar argument that out-of-pocket damages do not sufficiently deter fraud because "[i]f a cheat can anticipate that the worst that can happen is that he shall be called upon to pay back his profit on the trade, he may be encouraged to defraud."[151] We reject both arguments for the same reasons. Delaware has long recognized a public policy against deceit,[152] and deterrence may be an important function of tort law. But those concerns do not justify awarding benefit-of-the-bargain tort damages exceeding the scope of the plaintiff's cognizable injuries.

Delaware law does allow plaintiffs to seek punitive damages where, among other things, the ordinary measure of damages is not sufficient to address the defendant's culpable conduct.[153] But LCT did not seek punitive damages in its amended complaint,[154] and LCT does not appeal the Superior Court's refusal to allow it to amend its fraud claim to add punitive damages.[155] Thus, LCT's public policy and deterrence arguments do not justify awarding benefit-of-the-bargain damages.

---

[150] *Id.* at 40-42.

[151] Opening Br. 20 (quoting C. McCormick, Handbook on the Law of Damages § 121 (1953)).

[152] *See, e.g.*, *Abry P'rs V, L.P. v. F&W Acq. LLC*, 891 A.2d 1032, 1035 (Del. Ch. 2006) ("The public policy against fraud is a strong and venerable one founded on the societal consensus that lying is wrong.").

[153] *See, e.g.*, *Stephenson*, 462 A.2d at 1076-77 ("If the fraud is gross, oppressive, or aggravated, or where it involves breach of trust or confidence, the plaintiff may recover punitive damages whether he sues in tort or under the consumer fraud statute.") (citations omitted).

[154] *See* A296-98.

[155] *Compare* A1300 (the Superior Court denying LCT's request to amend its fraud claim to include punitive damages) *with* Opening Br. (not appealing the Superior Court's refusal to allow LCT to amend its complaint and add a request for punitive damages).

Fourth and finally, LCT argues that NGL waived any argument challenging benefit-of-the-bargain damages by failing to object to the availability of such damages until after the jury reached its verdict.[156]  Although perhaps a closer call, we think that NGL sufficiently raised an objection to benefit-of-the-bargain damages by objecting to testimony related to contract damages[157] and by proposing a limiting instruction to the jury on damages.[158]  And even if NGL did not properly object, we think that awarding benefit-of-the-bargain damages on the facts of this case would be a plain error for the reasons provided above.

## B. The Superior Court Abused Its Discretion by Ordering a New Trial on Fraud Damages

NGL argues on cross-appeal that the Superior Court abused its discretion by ordering a new trial on the damages for fraudulent misrepresentation because "the only compensable loss that LCT identified was the value of the work it performed," and "the $4 million *quantum meruit* award fully compensates LCT for the value of its services. . . .  Because LCT cannot recover for the same loss twice, and no additional damages are recoverable, no justification exists for another trial."[159]  Assuming benefit-of-the-bargain damages are unavailable, LCT concedes this point, noting that "[i]f given an out-of-pocket jury

---

[156] *See* Opening Br. 3; Reply Br. 21-22.

[157] *See* A493-94 (Counsel for NGL argued that "[Talarico] testified that he had an oral contract with my client.  And, obviously, I don't need to tell the Court there's no oral contract in this case.  So we're concerned that language of that nature is potentially both prejudicial and very confusing to the jury.").

[158] *See* B2224 ("And we have three brief additional proposed instructions . . . . One is that the jury is not ruling on a contract claim . . . .").

[159] Answering Br. 52-53.

instruction, the jury would have realized that no damages could be awarded for fraud because LCT put in no evidence of out-of-pocket damages."[160]

Given this concession, we hold that the Superior Court abused its discretion by ordering a new trial on fraud damages. LCT presented a unitary theory of damages at trial that focused exclusively on the value of the services that it provided related to the TransMontaigne acquisition.[161] Because benefit-of-the-bargain damages are unavailable, LCT is limited to seeking out-of-pocket damages equal to the fair value of the services that it provided without compensation. This measure of damages is identical to the compensation that LCT is entitled to receive for its *quantum meruit* claim,[162] and LCT cannot recover twice for the same loss.[163] Thus, LCT did not assert any independent damages to support the fraud claim, and *quantum meruit* damages will fully compensate LCT for its loss. For this reason, the Superior Court erred by submitting the fraud claim to the jury. LCT's fraud claim failed because it was not supported by damages independent from the *quantum meruit* claim. Accordingly, we hold that the jury's fraud verdict should be stricken and reverse the Superior Court's holding that a new trial is needed to determine LCT's fraud damages.

---

[160] Reply Br. 35.

[161] *See, e.g.*, A1295 (The Superior Court stated "the damages are the damages whether it's *quantum meruit* or its fraudulent misrepresentation. There's been no evidence separating them. They're the same.").

[162] *See, e.g.*, *O'Riley v. Rogers*, 69 A.3d 1007, 1010 (Del. 2013).

[163] *See, e.g.*, *Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1024 (Del. 2001).

Because we hold that LCT's fraud claim should not have reached the jury, we need not reach NGL's separate arguments that the Superior Court erred by declining to dismiss the fraud claim as a matter of law because LCT failed to prove reliance[164] or that the Superior Court erred by improperly instructing the jury on the elements of fraud.[165]

## C. The Superior Court Did Not Abuse Its Discretion by Ordering a New Trial on *Quantum Meruit* Damages

NGL argues on cross-appeal that "the [Superior Court] erred by striking the jury's *quantum meruit* verdict and ordering a new trial covering *quantum meruit* damages" because the Superior Court waited too long to *sua sponte* order a new trial on damages and abused its discretion by ordering a new trial on the basis of jury confusion.[166] LCT raises its own objections, arguing that the Superior Court's jury instruction improperly excluded damages for the value created by the TransMontaigne transaction[167] and that NGL failed to properly raise this issue on appeal.[168] We address each issue in turn.

---

[164] Answering Br. 54.

[165] Answering Br. 60. *But see Wal-Mart Stores Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 115 (Del. 2006) ("Equitable fraud differs from common law fraud in one respect—the defendant need not know that the representation is false.") (citation omitted); *Stephenson*, 462 A.2d at 1074 ("At common law, fraud (or deceit) consists of . . . the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth . . . .").

[166] Answering Br. 49, 49-53.

[167] Reply Br. 34

[168] *Id.* at 32 n.11.

### 1. The Superior Court did not *sua sponte* order a new trial on *quantum meruit* damages based on potential jury confusion

NGL argues that the Superior Court waited too long to *sua sponte* set aside the jury's *quantum meruit* verdict under Superior Court Civil Rule 59(c).[169]  Although Rule 59(c) gives the Superior Court ten days to *sua sponte* set aside a verdict, here the Superior Court waited sixteen months before setting aside the award, which NGL claims that neither party challenged.[170]

This argument fails to account for NGL's own post-trial motion challenging the fraud damages and the connection between the two damages awards.  Among other things, NGL argued in its post-trial motion that because

> LCT advanced a unitary damages theory at trial that presented no difference between the actual value of its services (*quantum meruit*) and its loss due to NGL's alleged fraudulent misrepresentation . . . any recovery for fraudulent misrepresentation is limited to LCT's actual pecuniary loss for the value of its service—which the jury found to have been $4 million . . . .[171]

NGL also argued that "LCT's damages presentation created a significant risk of jury confusion, especially if there was a second damages blank."[172]

---

[169] *Id.* at 52.
[170] *See* Answering Br. 52; *LCT*, 2019 WL 6896463, at *1.
[171] B2684-85 (emphasis removed).
[172] B2687.

Although NGL raised both arguments in the context of challenging the fraud award,[173] we think that NGL's argument raised a problem common to both awards. Because LCT presented a unitary theory of damages, the Superior Court's dual-damages-line approach was confusing. Accordingly, we hold that the Superior Court did not *sua sponte* raise the issue of whether the dual damages lines confused the jury, casting doubt on the *quantum meruit* award. NGL flagged the issue in its post-trial motion.

### 2. The Superior Court did not abuse its discretion because the dual damages lines were confusing

NGL next argues that there is no need for a new trial for two related reasons: (i) the jury already found that the "fair value of the services that LCT provided NGL" was $4 million,[174] and (ii) "testimony from NGL's damages expert that a reasonable fee for the type of services LCT provided is . . . $1-$4 million" adequately supported the jury's verdict.[175]

We review the Superior Court's decision to order a new trial for abuse of discretion.[176] When considering whether to order a new trial, the Superior Court "must give 'enormous deference' to the jury's verdict."[177] "A new trial is warranted only if the jury's verdict is 'clearly the result of passion, prejudice, partiality, corruption, [or confusion] . . . .'"[178] "While

---

[173] *See* B2684-87.

[174] *Id.* at 50.

[175] *Id.*; *see also* B2395-96.

[176] *See, e.g.*, *O'Riley v. Rogers*, 69 A.3d 1007, 1010 (Del. 2013).

[177] *Cuonzo v. Shore*, 958 A.2d 840, 844 (Del. 2008) (quoting *Young v. Frase*, 702 A.2d 1234, 1236 (Del.1997)).

[178] *Reinco, Inc. v. Thompson*, 906 A.2d 103, 110 (Del. 2006) (alteration in original) (footnotes omitted) (quoting *Lang v. Morant*, 867 A.2d 182, 185 (Del. 2005)); *see also Storey v. Camper*, 401

we have at least acknowledged that a new trial is warranted if the jury's verdict was *clearly* the result of jury confusion, our case law is limited on the issue."[179]  Nonetheless, "[o]ther jurisdictions appear to require some evidence, beyond a 'gut feeling,' that the jury was in fact confused to set aside a verdict supported by the evidence."[180]

Under Delaware law, *quantum meruit* "allows a party to recover the reasonable value of his or her services . . . ."[181] We agree with NGL that the *quantum meruit* damages line— read in isolation—asked the jury the only question that mattered to determine LCT's damages.  "What do you find to have been the fair value of the services that LCT provided to NGL?"[182]  Nonetheless, we do not think that the Superior Court abused its discretion by holding that providing the jury with two damages lines for a single theory of damages confused the jury and muddied both the *quantum* meruit and fraud awards.  Presented with two different damages lines, the jury may have inferred that it was supposed to split a single damages award between the *quantum meruit* and fraudulent misrepresentation claims.

For example, NGL provided expert testimony that the standard investment banking fee for the TransMontaigne acquisition would have been between $1 to $4 million.[183]  In addition to contesting fraud liability, NGL's closing argument relied heavily on its expert's

---

A.2d 458, 465 (Del. 1979) (holding that the trial court should not set aside the jury's verdict "unless . . . a reasonable jury could not have reached the result.").

[179] *Reinco*, 906 A.2d at 110 n.15.
[180] *Id.*
[181] *Petrosky v. Peterson*, 859 A.2d 77, 79 (Del. 2004).
[182] A1338.
[183] *See, e.g.*, B2395-401; B1546-52.

testimony that LCT provided standard investment banking services worth a standard fee of $1 to $4 million.[184] The jury's $4 million *quantum meruit* award fell within this range.

On the other hand, the jury was presented with competing evidence suggesting that LCT provided unusually valuable services related to the acquisition. Most notably, before the fog of litigation NGL's CEO Krimbill asked that NGL's stockholders approve a compensation arrangement with LCT that would "equate[] to a $29 million success fee." Acknowledging that this fee "appears high compared to a typical 1%-2% investment banker success fee," Krimbill explained,

> We are looking at the fee from the perspective of the value created to the NGL General Partner and the very attractive purchase price of $200 million. LCT was able to get [Morgan Stanley] to deal directly with NGL outside of an auction process which may have saved us tens of millions of dollars. Other potential buyers . . . were estimated to be offering $450 million, per the Wall Street Journal.
>
> . . . .
>
> . . . I feel this is a fair arrangement, although seemingly expensive, as we never would have had this opportunity at our price without LCT bringing it to us.[185]

Krimbill also wrote that "[t]he value created for the NGL General Partner from this transaction is approximately $500 million,"[186] a large gain on a $200 million acquisition.

---

[184] *See, e.g.*, B2562-63, at 65:22-66:5 ("[Y]ou'll hear it some more from me in a bit – about customary investment banking fees; it's point five to two percent. On two hundred million, it gets you to four million dollars. . . . LCT wants almost thirty percent of the transaction value. It makes no sense. It has no perspective. Thirty percent.").

[185] A236-37.

[186] A236.

By NGL's own admission, the $29 million success fee that Krimbill proposed was more than ten times larger than the standard investment banking fee.[187] LCT's closing argument relied heavily on Krimbill's October 2014 letter to establish the reasonable value of LCT's services.[188]

With this evidence in mind, we do not think that the Superior Court abused its discretion concluding that the dual damages lines confused the jury, requiring a new trial on damages. The record supports the court's conclusion that the jury could have found that LCT provided services worth more than the standard investment banking fee but inferred that it was supposed to spread that single award across the two different damages lines. Thus, the *quantum meruit* damages award may have compensated LCT for the baseline value of its investment banking services, and the fraudulent misrepresentation damages award may have compensated LCT for the extraordinary services that it provided unique to the TransMontaigne acquisition. If this occurred, it would be necessary to add both awards to capture the full value that the jury placed on LCT's uncompensated work.

---

[187] *See, e.g.*, Answering Br. 50 ("Having been properly instructed on *quantum meruit* damages, the jury determined that the value of LCT's services was $4 million after considering seven days of trial focused on this precise question, including testimony from NGL's damages expert that a reasonable fee for the type of services LCT provided is .5%-2% of the deal price, or $1-$4 million . . . .").

[188] *See, e.g.*, B2543-44, at 46:19-47:4 ("You may remember from Mr. Krimbill's October 24th letter, he adds twenty-nine. He doesn't break it out in the letter, but what he obviously is referring to is the value of the two percent interest and the value at the time of the three percent option, assuming an exercise price at a seven hundred million dollar valuation, and a[n] overall valuation of the NGL General Partner at one billion. So that's twenty-nine.").

Further, the Superior Court provided the jury with minimal guidance regarding how to measure fraud damages, instructing the jury that if LCT proved the elements of fraud, "you should determine the damages that LCT suffered that are the direct result of the false representations."[189] The lack of specific instructions regarding how to measure fraud damages makes it all but impossible to determine, in retrospect, whether the $29 million award was impermissible benefit-of-the-bargain damages, compensation for LCT's extraordinary services, or something else.

We do not mean to express certainty that the jury was so confused. It is also possible that the jury found that the fair value of LCT's services was $4 million, and the $29 million fraud award solely reflected impermissible benefit-of-the-bargain damages. Nonetheless, given the deferential standard of review, and the risk of confusion unique to this case, we do not think that the Superior Court abused its discretion by holding that providing the jury with dual damages lines for a unitary theory of damages was confusing and irreparably muddied the jury's *quantum meruit* award. At this juncture, there is no satisfactory way to determine whether the dual damages lines confused the jury.

Accordingly, we affirm the Superior Court's order requiring a new trial to determine *quantum meruit* damages.

---

[189] A1323 (jury instructions sheet); *see also* B2624, at 127:17-20 (transcript of court's oral jury instructions) (same).

### 3. LCT's other arguments regarding the *quantum meruit* award fail

LCT's also raises two new issues related to the *quantum meruit* verdict. First, LCT argues that "[t]he *quantum meruit* jury instruction improperly precluded the use of 'value created' . . . to determine LCT's compensation . . . ."[190] We reject this argument on waiver grounds. LCT waited to include this argument in its reply brief,[191] but this is a legal issue "which should have been included in a full and fair opening brief."[192] Further, LCT failed to object to the *quantum meruit* damages instruction on this basis below.[193] Therefore, we hold that LCT has waived this issue on appeal.[194]

Second, LCT suggests—in a footnote—that NGL's request for interlocutory appeal did not properly raise a challenge to the Superior Court's decision to set aside the jury's *quantum meruit* award.[195] We reject this argument. As we recognized in the Order accepting this interlocutory appeal, "NGL sought certification of the Superior Court's setting aside of the $4 million *quantum meruit* verdict . . . ."[196] Thus, NGL properly raised the issue.

---

[190] Reply Br. 34.

[191] Compare Opening Br. (not raising this issue) with Reply Br. (raising this issue).

[192] Supr. Ct. R. 14(c)(i); *see also Roca v. E.I. du Pont de Nemours and Co.*, 842 A.2d 1238, 1242-43 (Del. 2004) (holding that the appellant "abandoned and waived [an] issue in his appeal . . . by raising it for the first time at oral argument") (citation omitted); *Cannon v. State*, 947 A.2d 1120, 2008 WL 1960131, at *2 (Del. May 6, 2008) (Table) ("[W]e have held that the 'failure of [an] appellant to present and argue a legal issue in the text of an opening brief constitutes a waiver of that claim on appeal.'" (quoting *Roca*, 842 A.2d at 1242-43)).

[193] *See* A1310-12.

[194] *See Roca*, 842 A.2d at 1243

[195] *Id.* at 32 n.11.

[196] Ex. C to Opening Br. 3.

## IV.  CONCLUSION

For the reasons provided above, the Superior Court's December 5, 2019 Memorandum Opinion is AFFIRMED IN PART and REVERSED IN PART.

**VAUGHN**, Justice, dissenting in part:

I agree with the Court's decision that the plaintiff's fraud claim fails because the plaintiff was not able to offer any evidence of damages that were proximately caused by fraud.

The defendants have cross-appealed, contending the trial court committed error by ordering a new trial on damages on the *quantum meruit* claim. I write this partial dissent because I think the defendants are correct.

The plaintiff began its closing argument at trial by discussing the *quantum meruit* claim and the measure of the reasonable value of the plaintiff's services. Early in the closing, plaintiff's counsel discussed Mr. Krimbill's letter of October 24, 2014, which contained a $29 million figure:

> Slide, please.
>
> Going back to Mr. Krimbill's October 24th letter, in the sixth paragraph, Mr. Krimbill said:
>
> "This equates to a twenty-nine million dollar success fee, which appears to be high compared to a typical one-percent-to-two percent investment bankers success fee."
>
> We will get to this in a minute.
>
> We are looking at the fee from the perspective of the value created in the NGL General Partner and the very attractive purchase price of two hundred million.[197]

---

[197] B2514.

As he continued to develop his argument for damages for the reasonable value of the plaintiff's services under the *quantum meruit* claim, plaintiff's counsel also discussed $43.8 million, which is the amount Mr. Talarico thought he had been promised. He wound up his *quantum meruit* argument by saying that the reasonable value of the plaintiff's services was one or the other of those two figures, to be decided by the jury in its discretion:

> So the crux of the dispute that you need to figure out is the range between twenty-nine million dollar valuation, which NGL has proposed, and the forty-three point eight million dollar valuation that LCT Capital believed and agreed to.
>
> This comes down to a credibility determination.
>
> Mr. Krimbill believes it's twenty-nine million. That's what he believed then. That's what he said now.
>
> LCT Capital believes it's forty-three point eight million.[198]

Plaintiff's counsel then discussed the fraud claim, rather briefly in comparison to the discussion of the *quantum meruit* claim, without making any mention of separate damages in connection with that claim.

In the defense closing, counsel argued that the plaintiff's numbers bore no relationship to the value of the plaintiff's services and, relying upon the testimony of a defense expert, Mr. Keller, argued that the reasonable value of the plaintiff's services was a range of $1.5 million to $4 million:

---

[198] B2544.

46

> We believe that the value of the services here falls within the fee grid that is customarily and well-recognized in this industry. That's .5 percent to 2 percent.
>
> It's a $1.5 million to $4 million swing. That's a lot of money.
>
> Those are the parameters that apply.
>
> There's been zippo evidence that any work exceeded those parameters.[199]

Defense counsel also argued generally that his clients had not committed fraud.

In his instructions, the trial judge clearly explained to the jury that two, separate claims were involved:

> LCT's claims against NGL, are for (1) *quantum meruit* for the value of the services it alleges it provided to NGL in connection with the TransMontaigne acquisition; and (2) fraudulent misrepresentation based on an alleged false representation made by Michael Krimbill, NGL's CEO, relating to the fee for the work performed by LCT.[200]

The trial judge then went on to give separate instructions on *quantum meruit* and fraud, including the damages recoverable under each claim.

There is nothing wrong with the verdict sheet the jury was given. It gave the jury a damages line to state its damages verdict on the *quantum meruit* claim and a separate line to state its damages verdict on the fraud claim, if the jury found fraud. A *quantum meruit* claim and a fraud claim are separate claims involving different facts and different legal injuries. They are not duplicative. Where, as here, two claims are separate and not duplicative, I think

---

[199] B2602-03.
[200] A1319.

all parties are entitled to have the jury consider each claim separately and render a separate damages verdict as to each. The parties need separately stated awards in order to be able to assess whether they think each damage award is supported by the evidence, or whether a post-trial motion is appropriate. I have never heard of trying two separate, nonduplicative claims before a jury and asking the jury to return its verdict as a single damages figure for both claims. The fact that a plaintiff decides for strategic or other reasons to present a so-called unitary damages theory where two separate claims are asserted does not change these principles.

It is obvious to me from the jury's verdict on the *quantum meruit* claim that it rejected the plaintiff's unitary damages approach and accepted the defense expert's opinion that the reasonable value of the plaintiff's services was the $4 million at the upper end of the range given by the defense expert.

During his closing, plaintiff's counsel argued that the reasonable value of LCT's services included value created in NGL by the transaction. Examples of this point are footnoted below.[201] The *quantum meruit* instruction, however, informed the jurors that they

---

[201] "We are looking at the fee from the perspective of the value created in the NGL General Partner and the very attractive purchase price of two hundred million." B2514. "I recognize working capital can be a difficult subject to understand. We hope we provided you with some information at trial. The critical thing here is that it provided an enormous value to NGL." B2516. "NGL proposed a success fee at the time of twenty nine million dollars." B2527. "LCT also thought it had agreed on an appropriate success fee." B2528. "Mr. Krimbill has changed his story on three critical issues here. A standard fee, the options and the taxes. On the first, on the standard fee, at the time he said the standard fee is inappropriate, it should be twenty nine million success fee." B2545.

were not to consider value created by the successful completion of the transaction. The instruction stated:

> The value of LCT's services under *quantum meruit* is not measured by any value created after NGL's acquisition of TransMontaigne. Instead, the standard for measuring the value of LCT's services under *quantum meruit* is the reasonable value of the services at the time they were provided.[202]

Given this instruction, it is not surprising to me that the jury would reject the plaintiff's argument that it should award the large "value created" or "success fee" that LCT sought, and, instead, accept the testimony of the defense expert.

The verdict sheet asked the jury whether the damages it found for *quantum meruit* were the same as the damages it found for fraud. The jury answered no. That answer is correct as there is no relationship between the $4 million figure it awarded for *quantum meruit* and the $29 million figure it awarded for fraud.

The jury was not confused. It knew what it was doing. Its *quantum meruit* damages award complied with the trial judge's instructions and is supported by the evidence. I would reverse the Superior Court's decision to order a new trial on damages on the *quantum meruit* claim.

---

[202] A1320-21.